## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Derek Coubal,

        Plaintiff,

v.

          **MEMORANDUM OPINION
AND ORDER**

Power Systems AHS, LLC,
          Civil No. 20-2296 ADM/JFD

        Defendant.

_____

Sam Kramer, Esq., and Joshua A. Newville, Esq., Madia Newville LLC, Minneapolis, MN, on behalf of Plaintiff.

Hal A. Shillingstad, Esq., and Colin H. Hargreaves, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

On February 17, 2022, the undersigned United States District Judge heard oral argument on Defendant Power Systems AHS, LLC's ("PS") Motion for Summary Judgment [Docket No. 27]. Plaintiff Derek Coubal ("Coubal") asserts a single cause of action for an alleged violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932. For the reasons set forth below, Defendant's Motion is granted.

## II. BACKGROUND

### A. PS' Business

PS is a critical sector business that provides hydraulic systems and components for other critical sector businesses, including those in the agricultural, transportation, energy, and power industries. Kramer Decl. Ex. A (Steinkamp Dep.) [Docket No. 40, Attach. 20] at 17:18-18:3; Shillingstad Decl. Ex. I [Docket No. 31, Attach. 2] at PSAHS000212. PS has its headquarters in

Chanhassen, Minnesota, and has satellite locations in Minnesota, Iowa, Nebraska, South Dakota, North Dakota, and Wisconsin.  Steinkamp Dep. at 16:15-18.

PS' operations at the Chanhassen facility include manufacturing and assembly, an engineering department, purchasing, warehouse and shipping, outside sales, and inside sales and service.  Id. at 47:20-48:5.

**B.  Coubal's Employment and Job Responsibilities at PS**

Coubal worked as a Customer Service Sales Representative ("CSSR") in the Chanhassen headquarters from 2001 until he was terminated in September 2020.  Kramer Decl. Ex. C (Coubal Dep.) [Docket No. 51] at 9:13-15, 11:21-12:6, 14:4-12; Steinkamp Dep. at 14:18-24.[1] He was one of six CSSRs employed at the Chanhassen facility.  Coubal Dep. at 63:22-25.  The CSSRs were supervised by Jeff Winkels ("Winkels").  Id. at 24:3-11; Steinkamp Dep. at 23:5-7.

CSSRs are vital to the company's operations, and PS does not operate without a CSSR at the facility.  Coubal Dep. at 22:19-23:4.  The job duties of a CSSR include processing customer orders and requests received by phone, email, fax, walk-in customers, and outside sales associates, recommending products from PS' internal inventory, reviewing customer orders and pending quotes to ensure timely shipments, and providing backup support to other associates within the facility.  Shillingstad Decl. Ex. E at PSAHS000001.[2]

Although many CSSR job functions can be completed by computer or phone, CSSRs occasionally perform the following in-office daily activities:  service walk-in customers at the "will call" window; pull items from warehouse shelves to ensure timely shipment of rush orders;

---

[1] The CSSR position is also referred to as an inside sales representative.  Coubal Dep. at 11:21-12:6.

[2] Unless otherwise indicated, Exhibits to the Shillingstad Declaration are found in Docket No. 53.

physically examine and evaluate items returned from customer returns; visually verify warehouse inventory of low-stock items to ensure PS does not promise an item to a customer that is no longer in stock; assist in product assembly for rush or custom orders; and provide backup support within the location.  Coubal Dep. at 20:7-11, 21:4-22:18, 26:12-25, 30:19-31:13, 34:23-42:1, 44:15-45:12, 46:16-47:11, 48:4-15; 49:9-24; Shillingstad Decl. Ex. E.  CSSRs also receive requests from other CSSRs working in satellite offices to visually check inventory in the Chanhassen warehouse to confirm the availability of an item, or to physically check the status of a production order in the warehouse.  Kramer Decl. Ex. D (Winkels Dep.) [Docket No. 40, Attach 23] at 18:7-11, 20:6-22.

The frequency of the CSSRs' on-site duties varies from day to day depending on customer demand, and it is not possible to predict when the need to perform these duties will arise.  Coubal Dep. at 42:9-43:8.  Coubal estimates that he spent no more than 30 minutes per week on duties that required him to be in the office.  Id. at 143:20-144:8.

## C.  COVID-19 Pandemic, Executive Orders, and Remote Work

On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. Shillingstad Decl. Ex. B (Executive Order 20-20) at 2.  In the weeks that followed, Minnesota Governor Tim Walz issued a series of stay-at-home orders aimed at preventing the community spread of COVID-19.  Id.  The orders included Executive Order 20-20 and Executive Order 20-48 (the "Executive Orders"), which both include a provision stating:

> **All workers who can work from home must do so.**  Workers in . . . Critical Sectors, who are performing work that cannot be done at their home or residence through telework or virtual work and can be done only at a place outside of their home or residence are exempted from the [stay-at-home] prohibition . . . .

Id. at 4; Shillingstad Decl. Ex. P (Executive Order 20-48) at 7 (emphasis in original).

Also in March, PS announced that it was phasing some of its staff to working remotely from home.  Kramer Decl. Ex. 5 [Docket No. 40, Attach 2]; Coubal Dep. at 61:13-18; Steinkamp Dep. at 41:14-23.  Employees were advised to "work with your immediate supervisor or team lead for plans specific to you and your location."  Kramer Decl. Ex. 5.  During this time, PS expected that its business volume would decrease by 30 to 50 percent due to the pandemic. Steinkamp Dep. at 39:10-17, 172:22-25.

Coubal and three other CSSRs from the Chanhassen headquarters began working remotely in March, while the remaining two CSSRs and supervisor Winkels continued to come into work each day.  Shillingstad Ex. H [Docket No. 31, Attach. 2] at PSAHS000214; Winkels Dep. at 24:21-25:3; Coubal Dep. at 60:10-24; Steinkamp Dep. at 42:4-43:15.  Coubal came into the office on Tuesdays because the orders for one of his customer accounts typically shipped on that day of the week, and Winkels asked him to be in the office in case issues arose with the processing and shipping of those orders.  Coubal Dep. at 60:3-6; 62:15-16, 64:7-23; Winkels Dep. at 28:8-29:3.

When working from home, Coubal could not perform in-person duties such as visually verifying inventory, picking items from the warehouse shelves for rush orders, preparing and packaging orders from will call customers, or helping other associates needing in-person assistance at the warehouse.  Coubal Dep. at 24:24-25:14; 26:12-25; Winkels Dep. 34:9-24. Other employees performed those duties for Coubal when he was working remotely.  Coubal Dep. at 25:3-14, 26:12-25, 41:12-42:1; Shillingstad Decl. Ex. G (Wishy Dep.) at 12:13-13:16, 15:8-22, 23:23-24:3.

**D.  PS Requires Employees to Return to In-Office Work**

On July 8, 2020, PS' general manager, Thomas Steinkamp ("Steinkamp"), sent an email to all supervisors advising them that employees should return to in-person work by July 20, 2020, unless there was a specific reason that an employee must work from home.  Kramer Decl. Ex. 6 [Docket No. 40, Attach. 5] at PSAHS000125.  A primary reason for requiring employees to return was that PS did not experience the anticipated reduction in business, and actually orders increased significantly during June and July.  Steinkamp Dep. at 153:5-8, 172:22-173:8; Shillingstad Decl. Ex. I at PSAHS000221.  Additionally, one of the CSSRs who had been working in the Chanhassen office during the pandemic resigned in June.  Shillingstad Decl. Ex. I at PSAHS000215; Coubal Dep. at 102:6-9.  Steinkamp determined that more CSSRs were needed in the office to meet the needs of PS' critical industry customers and to alleviate the added burden on CSSRs who were working in the office and handling a disproportionate share of the remote CSSRs' tasks.  Steinkamp Dep. at 153:2-154:19.  Coubal's supervisor, Winkels, forwarded the email to Coubal the next day to inform him about returning to work at the facility on July 20, 2020.  Kramer Decl. Ex. 6 at PSAHS000125.

**E.  Coubal Refuses to Return to Office**

On July 15, 2020, Coubal sent an email to Winkels stating that he would not return to working in the office because he had been at the facility the previous day and observed employees in a conference room not wearing masks or social distancing.  Id. at PSAHS000124. Coubal further stated:  "The Minnesota Department of Health has not changed their recommendations about employees working from home and are still encouraging employers to let employees that are able to work from home do so. . . .  When the Minnesota Department of Health updates their guidelines for employees returning to work in the office, I will then return to

working in the office."  Id.  Coubal attached the State's General Industry Guidance, which is directed toward "Non-Critical Sector businesses and employers" and includes several protocols, including a social distancing protocol stating:  "Maximize remote-working – Workers who are able to work from home must work from home."  Kramer Decl. Ex. E [Docket No. 40, Attach. 24] at PSAHS000127-28.

On July 17, 2020, Steinkamp emailed Coubal advising him that Coubal's concerns had been forwarded to "Corporate HR and Legal," and that changes to the State of Minnesota's Executive Orders were expected soon.  Kramer Decl. Ex. 7 [Docket No. 40, Attach. 6] at PSAHS000134.  Steinkamp told Coubal that "for the time being, you can continue to work from home.  I will let you know when I get formal guidance from Corporate."  Id.

On July 20, 2020, Coubal sent a reply email to Steinkamp that repeated his concerns about the lack of social distancing in the office.  Id. at PSAHS000133.  Coubal stated that "[p]er MN Dept. of Health and CDC guidelines we all should always be trying to maintain a 6-foot social distancing and if that is not possible then a mask should be worn."  Id.

On July 23, Steinkamp emailed Coubal to inform him that Governor Walz had issued a new Executive Order that included a mask mandate.  Kramer Decl. Ex. 10 [Docket No. 40, Attach. 7] at PSAHS000204.  Steinkamp told Coubal that the Executive Order would go into effect the next day and that all of PS' Minnesota facilities would implement the mask mandate at that time.  Steinkamp concluded the email by stating, "We are assuming this alleviates any of your concerns and expect you to return to the office starting on August 3, 2020, when you finish your vacation.  Please confirm."  Id.

Coubal responded by email the same day, telling Steinkamp:  "As per Governor Walz executive orders, all employees that are currently working from home must continue to work

from home.  As I stated in my original email to Jeff [Winkels], I will return to working in the office once Governor Walz updates his executive orders to state as such."  Id. (emphasis added).  Coubal's recitation of the language in the Executive Orders departs from the actual language of the Orders which state that "All workers who can work from home must do so."  Executive Order 20-20 at 4; Executive Order 20-48 at 7 (emphasis added).

Minutes later, Steinkamp emailed Coubal and stated, "Please copy me on that statement from the governor."  Kramer Decl. Ex. 10 at PSAHS000203.  Coubal responded by sending a link to the Minnesota Governor's website and attaching the State's General Industry Guidance dated July 22, 2020.  Id.  He cited to "Item # 1 under social distancing on page 3" of the Guidance, which states:  "Maximize remote-working – Workers who are able to work from home must work from home."  Id.; Shillingstad Decl. Ex. O at PSAHS000163.  Coubal then wrote"  "Governor Walz never revised his executive orders about employees working from home.  As from the beginning, employees working from home must continue to work from home.  The email you sent to managers on July 8th recalling employees violated this executive order and should never have been sent."  Kramer Decl. Ex. 10 at PSAHS000203 (emphasis added).  Coubal's recitation of the Executive Orders again misstates the Orders, which provide that "All workers who can work from home must do so."  Executive Order 20-20 at 4; Executive Order 20-48 at 7.

On July 29, 2020, Steinkamp responded to Coubal's July 23 email by advising him that Executive Order 20-48 permitted PS to require Coubal to return to work because he could not perform all of his job functions from home:

> We are a critical sector employer and as such are governed by order 20-48.  Per this order, while individuals who can work from home should, if their work cannot be performed by telework or virtual work, then we are permitted to have our associates come in to work.  At this time, we are down an associate . . . in

your department and have customers ramping back up.  As we have reviewed the type of work that is required to be done by your department, it is not possible to have it fully performed without individuals in the department being at the office. We cannot fully function without folks in the office at this point.  If you work from home, you are only able to complete part of your work responsibilities, which is not acceptable, especially in light of our increasing workload.  You are needed in the office so that you can perform all of your job obligations.  We do not have the luxury of allowing associates to perform only part of their job obligations at this point.

Kramer Decl. Ex. 10 at PSAHS000202.  Steinkamp ended the email by stating, "Since you are on vacation this week . . . we expect you in the office on Tuesday [August 4]."  Id.

Coubal worked remotely in August following his vacation because in early August his wife tested positive for COVID-19 and he was quarantined.  Coubal had a second quarantine later that month to prepare for a medical procedure.  Coubal Dep. at 100:6-101:16, 103:23-104:4, 109:24-110:03.

After the medical procedure, Steinkamp emailed Coubal on August 28 and informed him that "[a]ll associates are required to report to work for their scheduled days in order to ensure all work is timely performed and that no single associate bears a disproportionate burden of the work load. . . . [W]ork has increased to the point that it is simply not possible to manage it all under our prior at work and work from home split."  Kramer Decl. Ex. 13 [Docket No. 40, Attach. 8] at PSAHS000296.  Steinkamp told Coubal that he was "scheduled to report to work for the week of 8/31/20-9/4/20" and that "[f]ailure to do so will result in discipline."  Id.

On August 31, the day he was to report to the facility, Coubal emailed Steinkamp refusing to work in the office.  Id. at PSAHS000295.  He stated that he would not return to the office until the Governor revised the Executive Orders, and that "there is no exemption for employees working from home."  Id.  Coubal told Steinkamp to "[c]heck with state officials yourself, they will tell you the same thing."  Id.  He also informed Steinkamp that his wife was

still experiencing complications from COVID-19 and that he had to continue to work from home to take care of his wife and son.  Id.

Steinkamp responded by asking Coubal if he needed FMLA paperwork and, if not, that he would need to "come in to work for your assigned week."  Id.[3]  Coubal did not respond, did not report to the office on August 31, did not request FMLA leave paperwork, and continued working from home.  Coubal Dep. 108:7-10.

**F. Coubal and PS' Communications with State's Work from Home Hotline**

In late July or early August, both Coubal and PS' in-house counsel, Candice Miller ("Miller"), communicated separately with the State of Minnesota's Work from Home Violations Helpline ("Helpline") about PS' requirement that Coubal return to in-office work.  Mendoza Decl. [Docket No. 44] ¶ 6; Mendoza Decl. Ex. A [Docket No. 47]; Lucio Decl. [Docket No. 45] ¶ 6; Lucio Decl. Ex. A [Docket No. 48].  The primary role of the Helpline is to provide information and outreach about the content of the Executive Orders.  Shillingstad Decl. Ex. W at DC000066.  The Helpline does not make final determinations about whether a specific employer can require its employees to work in the office.  Id. at DC000154.

Coubal told the Helpline staff on August 4, 2020, that PS was bringing employees back to the office "because everything is slowing down, no reason to be working at home."  Mendoza Decl. Ex. A at DC000028.  Helpline staff member Sara Mendoza ("Mendoza") responded by telling Coubal that if a worker can do their job from home, then the Executive Orders required

---

[3]  According to Coubal's deposition testimony, at the time PS was requesting Coubal to return to the office for his "assigned week," the CSSRs were operating on a rotating schedule under which they would alternate weeks working from home and working in the office.  Coubal Dep. at 151:15-152:2.  Coubal had known about the rotating schedule no later than September 1, 2020, the week he was assigned to take his turn working in the office.  Id. at 151:20-23.  Despite the rotating schedule, Coubal persevered in his position that he would not work any days in the office.  Id. at 152:3-5.

them to work from home, even if they could not complete their job duties as efficiently or productively as they did while in the office.  Mendoza Decl. ¶¶ 8- 9; Mendoza Decl. Ex. A at DC000032.  She also told him that reasonable accommodation requests should be considered for employees who cannot complete their work from home.  Mendoza Decl. Ex. A at DC000033.

Mendoza similarly told PS' in-house counsel, Miller, that workers who can do their jobs from home must do so and that there were no exceptions for efficiency or productivity. Mendoza Decl. ¶¶ 8-9.  Miller responded by telling Mendoza that PS was calling employees back to the office because there had been an increase in business and a reduction in staff, and that while CSSRs were able to perform most of their work from home, some of their job duties required them to be at the facility.  Mendoza Decl. Ex. A at DC000027.

In late August, Coubal spoke with Mendoza about PS' continued demand that he return to the office.  Id. at DC000032.  After the call, Mendoza sent Coubal an email in which she offered to contact PS about the situation and asked Coubal to give her a summary of his work and how he is able to perform it at home.  Id.  Coubal responded by telling Mendoza that his job "entails entering orders, taking calls or emails from customers, and providing tech support for the customers.  All of which I have been currently doing from home."  Id. at DC000038.   Coubal did not inform any Helpline staff member that he could not perform all of his job functions from home.  Coubal Dep. at 123:5-12.

On September 2, 2020, Miller emailed Mendoza a list of duties that CSSRs cannot perform at home.  Shillingstad Decl. Ex. H at PSAHS000301.  The next day, Mendoza emailed Coubal stating that "this has gotten to a point of factual disagreement, and so at this point I do recommend that you contact a private attorney to pursue the issue further.  Our role is primarily one of information and outreach, and we are able to provide some pushback, however we do not

have the ability to perform a legal dispute with the employers, which this has turned into."
Shillingstad Decl. Ex. W at DC000066.

On September 11, 2020, Mendoza emailed Miller to tell her "I am still not able to give
you a 'final' green light on asking employees back to the office . . . because I do not make final
determinations." Id. at DC000154.  Mendoza reiterated that if employees can work from home
they must do so as much as possible, and that if they are not able to do so they may be asked to
work in the office for tasks that cannot be done from home.  Id.

**G.  PS Fires Coubal**

On September 11, Steinkamp and human resources director Mary Lekan ("Lekan") each
called Coubal separately and told him that he was required to return to work at the facility.
Steinkamp Dep. at 66:7-19; 91:12-18; Kramer Decl. Ex. B (Lekan Dep.) [Docket No. 40, Attach.
21] at 12:2-15; 43:9-13; 45:20-46:4.  Lekan told Coubal to report to work on September 14 and
that failure to do so would be considered job abandonment.  Lekan Dep. at 45:20-46:6.  She also
discussed leave options with Coubal.  Id. at 44:8-13.  During both phone calls, Coubal became
argumentative and continued to insist that he would work from home until the Executive Orders
were lifted.  Steinkamp Dep. at 91:10-22; Lekan Dep. at 37:23-38:24; 44:8-16.

Coubal did not return on September 14, and PS revoked his remote access credentials to
disable his access the company's computer network.  Steinkamp Dep. at 29:16-21; 93:7-19.
Coubal did not attempt to contact PS after his access was terminated.  Id. at 93:25-94:4.  The
next day, one of Coubal's colleagues texted Coubal to tell him that he had removed some things
from Coubal's desk.  Coubal Dep. at 142:12-17.  The colleague asked if there was anything else
he should take, and Coubal told him to "grab my personal stuff."  Id. at 142:17-20.

On September 16, 2020, Lekan wrote to Coubal and told him that he was being placed on unpaid leave, and that he must return to work on September 21, 2020, or he would be fired for job abandonment.  Shillingstad Decl. Ex. Z (September 16, 2020 Letter).  Coubal did not return on September 21, and did not contact anyone at PS.  Coubal Dep. at 140:15-19; 142:1-4.  On September 30, 2020, Lekan wrote to Coubal and told him he had been terminated for job abandonment.  Shillingstad Decl. Ex. AA (September 30, 2020 Letter).

In November 2020, Coubal filed this lawsuit in Minnesota state court, alleging that PS violated the MWA when it placed him on unpaid leave and fired him for reporting a violation of the Executive Orders and refusing to violate the Executive Orders.  Compl. [Docket No. 1, Attach. 1].  PS removed the action to federal court.  Notice Removal [Docket No. 1].

PS argues it is entitled to summary judgment because Coubal did not engage in protected activity under the MWA, and because PS' termination of Coubal was not causally connected to Coubal's alleged protected activity.  PS further contends that Coubal cannot show that its legitimate reason for firing him is pretext for discrimination.  Coubal argues that summary judgment must be denied because the record includes evidence that Coubal had an objective basis in fact for believing that the Executive Orders required him to work remotely, and that he reported this to PS in good faith.

### III.  DISCUSSION

#### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

252 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor.  <u>Ludwig v. Anderson</u>, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate.  <u>Id.</u>  However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment."  <u>Get Away Club, Inc. v. Coleman</u>, 969 F.2d 664, 666 (8th Cir.1992).  "Instead, 'the dispute must be outcome determinative under prevailing law.'"  <u>Id.</u> (quoting <u>Holloway v. Pigman</u>, 884 F.2d 365, 366 (8th Cir.1989)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir.2011) (en banc).

## B.  Minnesota Whistleblower Standard

The Minnesota Whistleblower Act ("MWA") prohibits an employer from discharging or disciplining an employee for engaging in protected conduct, including when:

> (1) the employee . . . in good faith, reports a violation [or] suspected violation . . . of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official; [or]
>
> …
>
> (3) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason.

Minn. Stat. § 181.932 subd. 1(1), (3).

A retaliation claim under the MWA may be proven by direct evidence or, in the absence of direct evidence, under the burden-shifting framework announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Scarborough v. Federated Mut. Ins. Co.</u>, 996 F.3d 499, 505 (8th Cir. 2021); <u>Pedersen v. Bio-Med. Applications of Minn.</u>, 775 F.3d 1049, 1054 (8th Cir. 2015); <u>Wood v. SatCom Mktg., LLC</u>, 705 F.3d 823, 828 (8th Cir. 2013).

**C.  No Direct Evidence**

"[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  <u>Wood</u>, 705 F.3d at 828 (quoting <u>Griffith v. City of Des Moines</u>, 387 F.3d 733, 736 (8th Cir.2004)).  Such evidence "includ[es] evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." <u>Sellner v. MAT Holdings, Inc.</u>, 859 F.3d 610, 614 (8th Cir. 2017) (quoting <u>Thomas v. Heartland Emp. Servs. LLC</u>, 797 F.3d 527, 529-30 (8th Cir. 2015) (alterations in the original)).  "'Direct' refers to the causal strength of the proof, not whether it is circumstantial evidence."  <u>Id.</u>

Coubal argues that Lekan's September 16 and September 30 letters are direct evidence of retaliation because the letters identify a specific link between Coubal's refusal to return to the office and PS' adverse actions against him.  The September 16 letter urges Coubal to return to the office to perform his share of in-office duties, and warns him that he could be terminated for job abandonment based on his failure to report for work at the facility and his failure to contact PS about his absence.  Shillingstad Decl. Ex. Z.  The September 30 letter states that Coubal's employment with PS was being terminated because he failed to report to the office to perform

essential components of his job that could not be completed at home, and he did not

communicate with management about his absence.  Shillingstad Decl. Ex. AA.

Although the letters show a link between Coubal's refusal to report to the office and PS'

adverse employment actions, they cite a legitimate reason for the actions---namely, Coubal's

repeated failure to report to the office and perform his essential job duties.  "Termination for

repeated failure to perform one's job duties cannot be characterized as direct evidence of a

prohibited motive."  Wood v. SatCom Mktg., LLC, 705 F.3d 823, 829 (8th Cir. 2013).

Accordingly, the letters are not sufficient to support a finding by a reasonable fact finder that an

illegitimate criterion motivated the adverse employment actions.

**D.  No Prima Facie Case of Retaliation**

Absent direct evidence, Coubal must establish his MWA claim using the McDonnell

Douglas burden-shifting framework.  Scarborough, 996 F.3d at 505; Pedersen, 775 F.3d at 1054.

Under that framework, Coubal bears the initial burden of establishing a prima facie case by

showing "(1) he engaged in protected conduct, (2) he was subjected to an adverse employment

action, and (3) there was a causal connection between the protected conduct and the adverse

action."  Scarborough, 996 F.3d at 505.  "If the plaintiff establishes a prima facie case, the

burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the action."  Id.

(quoting Naguib v. Trimark Hotel Corp., 903 F.3d 806, 811 (8th Cir. 2018)).  If the employer

does so, the burden shifts back to the plaintiff to prove that the employer's stated reason is

pretextual.  Id.

**1.  No Protected Conduct**

Coubal alleges that his conduct was protected under subdivision 1(1) of the MWA

because he made a good-faith report of a suspected violation of the law, and that his conduct was

also protected under subdivision 1(3) of the MWA because he refused to perform an action that he objectively believed violated the law.

### a. Report of Violation

An employee's conduct in reporting a suspected violation is protected under subdivision 1(1) of the MWA if: "there is a federal or state law or rule adopted pursuant to law that is implicated by the employee's complaint, the employee reported the violation or suspected violation in good faith, and the employee alleges facts that, if proven, would constitute a violation of law or rule adopted pursuant to law." Abraham v. Cnty. of Hennepin, 639 N.W.2d 342, 354–55 (Minn. 2002); accord Kratzer v. Welsh Cos., LLC, 771 N.W.2d 14, 19 (Minn. 2009) (quotations omitted). A report is made in "good faith" if it is "not knowingly false or made with reckless disregard of the truth." Friedlander v. Edwards Lifesciences, LLC, 900 N.W.2d 162, 165–66 (Minn. 2017).

Coubal's report of a violation of the Executive Orders is not protected because Coubal did not "allege[] facts that, if proven, would constitute a violation of law or rule adopted pursuant to law." Abraham, 639 N.W.2d at 354–55. The facts reported by Coubal were that he was working from home and because he was currently doing so, the Executive Orders required him to continue to work from home. See Kramer Decl. Ex. 10 at PSAHS000204 ("As per Governor Walz executive orders, all employees that are currently working from home must continue to work from home."); Id. at PSAHS000203 ("As from the beginning, employees who are currently working from home must continue to work from home."); Kramer Decl. Ex. 13 at PSAHS000295 ("[T]here is no exemption for employees working from home."). In his deposition, Coubal confirmed that he based his report on the fact that he was already working from home. See Coubal Dep. at 66:6-8 ("My understanding is that for anybody that was

currently working at home that they should continue to keep working from home.”); Id. at 69:5-
12 (stating his concern was based on “the governor’s order that I was already working from
home that I should continue working from home”).

Coubal’s reported facts---that PS was requiring him to come back to the facility when he
was currently working from home---do not constitute a violation of law.  The Executive Orders
do not prohibit an employer from requiring an employee who has been working from home to
return to the office to perform a job that requires in-office work.  Indeed, the Executive Orders
expressly state that critical sector workers can be required to report to the office to perform
“work that cannot be done at their home or residence through telework or virtual work and can
be done only at a place outside of their home or residence.”  Executive Order 20-20 at 4;
Executive Order 20-48 at 7.

Coubal admitted in his deposition that he misstated the Executive Orders and that
Steinkamp’s July 8, 2020 email did not violate the Executive Orders.  Coubal Dep. 86:20-87:22.
Because the facts reported by Coubal do not constitute a violation of the law, his report is not
protected activity.  See Kratzer, 771 N.W.2d at 22 (“The proper standard to apply when
assessing the legal sufficiency of a claim under the whistleblower statute is to assume that the
facts have occurred as reported and then determine . . . whether those facts ‘constitute a violation
of law or rule adopted pursuant to law.’”) (quoting Abraham, 639 N.W.2d at 355)).

Resisting this conclusion, Coubal argues that although he sometimes misstated the
Executive Orders, he accurately described them on other occasions.  For example, in his email to
Winkels on July 15 Coubal stated that employees who are able to work from home must be
permitted to do so, and during phone calls with Steinkamp and Lekan he repeated the Executive
Orders.  While it is true that Coubal at times accurately described the Executive Orders, his

reported justification for asserting that he was "able" to work from home (and thus required to do so) was that he was already working from home.

To the extent, if any, that Coubal reported he could perform all of his job duties from home, no reasonable juror could find that the report was made in good faith. Coubal had worked as a CSSR at PS for 19 years, knew his job well, and admits that his position included several job duties that could not be performed from home. Those duties included servicing walk-in customers, examining and evaluating items returned by customers, performing physical checks of low inventory to confirm a product is in stock, and assisting with the assembly and shipping of products that required urgent shipping. Shilling Decl. E; Coubal Dep. at 20:7-11, 21:4-22:18, 26:12-25, 30:19-31:13, 34:23-42:1, 44:15-45:12, 46:16-47:11, 48:4-15; 49:9-24. Although Coubal argues that he spent less than 30 minutes per week on duties that he "had to be in the shop to do," he admits that the need to perform those duties could arise at any time during the work day, and that the facility could not operate without a CSSR on site. Coubal Dep. at 22:19-23:4, 42:9-43:8, 143:20-144:8. Thus, the undisputed evidence shows that Coubal's report that he could perform all of his job duties from home was knowingly false or made with reckless disregard of the truth. Because Coubal's reported facts did not constitute a violation of the law and his report was not made in good faith, his reporting conduct is not protected.

### b. Refusal to Violate Law

An employee's refusal to perform an employer's order is protected conduct if the employee has an "objective basis in fact" to believe that the order violates the law. Minn. Stat. § 181.932, subd. 1(3); Chavez-Lavagnino v. Motivation Educ. Training, Inc., 767 F.3d 744, 748 (8th Cir. 2014); Boelter v. City of Coon Rapids, 67 F. Supp. 2d 1040, 1051 (D. Minn. 1999). The "objective basis in fact" standard requires a plaintiff to have more than a "conjectural belief

that a violation of law had occurred."  Petroskey v. Lommen, Nelson, Cole & Stageberg, P.A., 847 F. Supp. 1437, 1448 (D. Minn. 1994), aff'd, 40 F.3d 278 (8th Cir. 1994).

Coubal offers several reasons why his belief that he could work from home was objectively based in fact.  First, he contends that he had performed his job remotely between March and July 2020, and found that he could do the "vast majority" of his duties from home more easily and with fewer disruptions, and that no one told him his work had suffered during this time.  Pl.'s Mem. Opp'n Summ. J. [Docket No. 38] at 7, 31.  This argument ignores that during this period Coubal was still coming into the office on Tuesdays to perform at least some of his share of in-office job duties, and other employees at the facility were performing Coubal's in-office duties when he was not there.  Coubal Dep. at 24:24-25:14, 26:12-25, 41:12-42:1; Winkels Dep. 34:9-24; Wishy Dep. at 12:13-13:16, 15:8-22, 23:23-24:3.

The argument also disregards that PS' business demands and staffing needs were not the same in July 2020 as they had been when Coubal was first permitted to work from home.  Orders had increased significantly and a CSSR representative had resigned.  Coubal was well aware of these changed circumstances because Steinkamp alerted him to them in a July 29, 2020 email:

> At this time, we are down an associate . . . in your department and have customers ramping back up.  As we have reviewed the type of work that is required to be done by your department, it is not possible to have it fully performed without individuals in the department being at the office. We cannot fully function without folks in the office at this point.  If you work from home, you are only able to complete part of your work responsibilities, which is not acceptable, especially in light of our increasing workload.

Kramer Decl. Ex. 10 at PSAHS000202.  Steinkamp also told Coubal in this email that Executive Order 20-48 permitted PS to have its associates come in to work if their work cannot be performed by telework or virtual work.  Id.  Coubal admits that some of his duties cannot be performed by telework or virtual work.  Accordingly, Coubal's experience working from home

between March and July 2020 was not an objective basis in fact for believing that he could work from home after PS had called him back to the facility to perform in-office work later that summer.

Coubal also argues that he had discussions with other CSSRs who expressed similar concerns about returning to the office, and that these discussions contributed to the factual basis for his belief that returning to the office would violate the Executive Order.  However, like Coubal, these colleagues were basing their opinions on their remote working experiences between March and July 2020, when business was slower, staffing was higher, and in-office employees were relied on to perform duties that could not be completed from home.  See, e.g., Kobold Decl. [Docket No. 42] ¶¶ 5-9.

Coubal further contends that PS did not provide him with information that made his belief objectively unreasonable, because the first time PS identified any specific tasks he could not complete from home was in Lekan's September 16, 2020 letter.  This argument is flawed because Coubal did not need PS to tell him which of his job duties could not be performed remotely.  He knew this information from having worked at PS as a CSSR for 19 years.  As Coubal admitted in his deposition, his responsibilities as a CSSR required him to regularly perform in-office functions, and PS' facility cannot operate without a CSSR in the office.  Coubal Dep. at 22:19-23:4; 42:9-43:8, 143:20-144:8.

Coubal also argues that his communications with the Helpline added to his basis for refusing to return to work.  However, Coubal's refusal to return to the office began weeks before he contacted the Helpline.  When he did eventually consult with the Helpline staff, he did not tell them that he could not perform all of his job functions from home.  Id. at 122:22-123:12.  Rather, he told them that his job "entails entering orders, taking calls or emails from customers, and

providing tech support for the customers.  All of which I have been currently doing from home."
Mendoza Decl. Ex. A at DC000028.

On this record, no reasonable juror could conclude that Coubal had an objective basis in
fact to believe that returning to in-person work would violate the Executive Orders.  Since
Coubal has failed show that he engaged in protected conduct, he cannot establish a prima facie
case of retaliation under the MWA.

**2. No Causal Connection**

Even if Coubal could show that he engaged in protected activity, the evidence does not
support an inference that he was fired for reporting a violation of the Executive Orders or for
refusing to return to work while the Executive Orders were in effect.

After Coubal's initial report and refusal on July 15, 2020, PS worked with him for two
months seeking to have him report to the office to perform his job duties that could not be
completed from home.  When PS suspended his remote access on September 14, Coubal did not
report to work at the office, did not contact PS, and permitted a coworker to remove his
belongings from the facility.  He also failed to respond to Lekan's final warning letter of
September 16 that asked him to report to work on September 21.

Given this evidence, any inference that PS' adverse actions in September 2020 were
related to his allegedly protected whistleblowing conduct in July 2020 is undermined by
Coubal's subsequent actions in refusing his employer's directive to return to the facility to
perform essential job functions that indisputably could not be performed at home.  "[T]he anti-
discrimination statutes do not insulate an employee from discipline for violating the employer's
rules or disrupting the workplace."  Griffith, 387 F.3d at 738.

### 3. No Evidence of Pretext

Further, even if Coubal were able to establish a prima facie case of retaliation under the MWA, PS has articulated a legitimate reason for firing him---job abandonment. Coubal concedes that PS' proffered reason is legitimate and non-retaliatory, but argues that the stated reason is pretext for retaliation. Pl.'s Mem. Opp'n Summ. J. at 40. PS argues that it is entitled to summary judgment because Coubal cannot satisfy his burden of showing that PS' legitimate reason for termination is pretext.

"An employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification." Pedersen, 775 F.3d at 1055 (quoting Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir.2005)). Proving pretext in a retaliation case thus requires the plaintiff to "both discredit [the] asserted reason for the [adverse action] and show the circumstances permit drawing a reasonable inference that the real reason for [the adverse action] was retaliation." Id. (quoting Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007) (alterations in original)).

Coubal cannot show that PS' legitimate reasons for terminating his employment are pretextual. PS fired Coubal for job abandonment after it tried nine times over the course of two months to get Coubal to return to work. Missing work in violation of an employer's directive and abandoning one's job are legitimate reasons for termination. See Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 916–17 (8th Cir. 2006) (holding that employer had legitimate reason for terminating plaintiff's employment because plaintiff missed work to take classes after employer denied employee permission to take classes due to a severe staffing crunch); Jackson v. Green, 502 F. App'x 633 (8th Cir. 2013) ("[D]efendants proffered a

legitimate, nondiscriminatory reason for Jackson's discharge: his manager believed he had abandoned his job . . . ."); <u>Jones v. United Parcel Serv., Inc.</u>, 461 F.3d 982, 992 (8th Cir. 2006) (stating that job abandonment is a legitimate reason for termination).

Coubal contends that this reason is pretextual because PS now cites its attendance policy as an additional basis for the decision to fire Coubal but did not mention the policy in its letters to Coubal on September 16 and 30.  Coubal argues that this added reason constitutes a shifting explanation for terminating his employment.  This argument fails because PS has consistently maintained that Coubal was fired for abandoning his job.  The added justification is not a substantial change from this originally stated reason but merely an expansion of it.  <u>See</u> <u>Phillips v. Mathews</u>, 547 F.3d 905, 913 (8th Cir. 2008) (holding that an additional reason for employee's discharge was not pretext because the employer did not change its justification but merely added to it); <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 835 (8th Cir. 2002) (holding that an elaboration of the reason for discharge was not a "substantial change" from the originally stated reason and was not probative of pretext).

Coubal also argues that the involvement of human resources, management, and legal counsel in his firing suggests there was a concerted effort to build a case for firing him and that PS was "papering Coubal's file."  Pl.'s Mem. Opp'n Summ. J. at 42.  There is nothing unusual about management, legal, and human resources working collaboratively when a company makes the decision to fire an employee.  Nor does PS' documentation of Coubal's employment issues evidence an attempt to "paper the file."

Coubal further contends that PS did not follow its policy for job abandonment because the policy provides that employees will be fired after failing to report for two days "without proper notice to their manager," but Coubal provided notice to Steinkamp and Lekan on

September 11 that he would not return to the office on September 14. This argument ignores that not only did Coubal fail to report to the office as requested on September 14, he did not respond to PS' September 16 letter giving him a final chance to report to work on September 21, and did not report to work on September 21.

Because Coubal has failed to show that PS' legitimate, non-discriminatory reason for terminating his employment were pretextual, summary judgment is granted.

### IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant Power Systems AHS, LLC's Motion for Summary Judgment [Docket No. 27] is **GRANTED**; and

2.    The Complaint [Docket No. 1, Attach. 1] is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/Ann D. Montgomery
Dated: May 16, 2022                     ANN D. MONTGOMERY
                                        U.S. DISTRICT COURT